IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHEILA YARBER, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CAROLYN W. COLVIN, Acting )<br>Commissioner of Social Security, )<br>)<br>Defendant. )<br>) | No. 13 C 139<br><br>Magistrate Judge<br>Maria Valdez |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying Plaintiff Sheila Yarber's claim for Disability Insurance Benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Plaintiff's motion for summary judgment [Doc. No. 10] is denied and summary judgment [Doc. No. 23] is granted in favor of the Commissioner.

## BACKGROUND

### I. PROCEDURAL HISTORY

On February 20, 2009, Plaintiff filed a claim for Disability Insurance Benefits, alleging disability since October 17, 2008. The claim was denied initially and upon reconsideration, after which she timely requested a hearing before Administrative Law Judge Jose Anglada (the "ALJ"), which was held on April 19,

2011. Plaintiff personally appeared and testified at the hearing and was represented by counsel. Vocational expert Grace Gianforte also testified.

On June 30, 2011, the ALJ denied Plaintiff's claims for Disability Insurance Benefits, finding her not disabled under the Social Security Act. The Social Security Administration Appeals Council (the "Appeals Council") then denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II. FACTUAL BACKGROUND

### A. <u>Occupational Background</u>

Plaintiff was born on May 14, 1960 and was fifty-one years old at the time of the ALJ's decision. (R. 29, 80.) She has some college education and has worked as a certified nursing assistant. She has also worked in retail sales and drapery making at a drapery and carpet store. (R. 57-60.)

### B. <u>Medical History and Opinions</u>

Because the issues addressed in this appeal are narrow, an exhaustive recounting of Plaintiff's medical history is not necessary. In brief, in October 2008, Plaintiff developed osteomyelitis (bone infection) in her spine that required a hospitalization of almost two months and treatment with antibiotics. She has also been diagnosed with osteoarthritis of the spine, and scans have shown a wedge compression deformity at T4 and degenerative changes. She experiences back pain

which is treated with pain medication. She has also been diagnosed with diabetes type 2, hypertension, and moderate obesity.

The record contains reports from one state examining physician and two reviewing physicians. (R. 537-551.) In October 2009, a state examining consultative physician, Dr. M.S. Patil M.D., examined Plaintiff and reviewed her medical records. Dr. Patil reported moderate limitation in the range of motion of Plaintiff's lumbar spine, but no redness, deformity, swelling, or tenderness of any joint. (R. 538-539.) Dr. Patil also noted degenerative changes to her spine described on a 2007 CT scan and described the diagnostic evidence associated with her osteomyelitis. (R. 539.)

In October 2009, medical consultant Dr. Vidya Madala, M.D. reviewed Plaintiff's records, including the report of Dr. Patil, and completed a residual functional capacity ("RFC") assessment indicating that Plaintiff could lift twenty pounds occasionally and ten pounds frequently, could stand or walk for about six hours in an eight-hour workday and sit for about six hours in an eight-hour workday, could only occasionally climb, stoop, kneel, or crouch. In notes, Dr. Madala indicated that the acute problem causing Plaintiff's hospitalization in 2008 would not be expected to last twelve months, and that Plaintiff's reported limitations with lifting and walking were supported by medical records. Plaintiff's file and Dr. Madala's RFC assessment were reviewed by Dr. Virgilio Pilapil, M.D. in February 2010. Dr. Pilapil, in affirming the RFC assessment, noted a lack of updated medical

3

records but indicated that a comparison of Plaintiff's ADL's (Activities of Daily Living) did not indicate significant worsening.

### C. Plaintiff's Testimony

At a hearing before the ALJ on April 19, 2011, Plaintiff testified that, prior to her hospitalization in 2008, she worked as a certified nurse's assistant, helping to feed and bathe and care for patients. At that job, she made nurse's notes, but did not dispense medication. At a prior job in a drapery and carpet store, she had sewn draperies using an industrial sewing machine. She had also sold draperies, had gone to people's homes to take measurements, and had made draperies according to specifications. (R. 56-60.)

Plaintiff testified that in October 2008 she had developed MRSA in her spine, which required hospitalization for two weeks and an eight-week course of antibiotics, and that following the infection she had inflammation and swelling that had not gone down. She testified that she had been treated with antibiotics, pain patches, pain medication, and physical therapy. She testified that her medications reduced her level of pain from "seven or eight" out of ten to six out of ten. (R. 60-64.)

Plaintiff stated that she could lift and carry five or six pounds, could walk about a block and back, and could stand for ten to fifteen minutes and sit for about thirty minutes. (R. 65.) As to daily activities, Plaintiff testified that she lived with her sister and her sister's husband, and that she could cook her own breakfast and prepare a sandwich for lunch. She testified that she could do laundry only with assistance because bending aggravated her pain. (R. 66, 70.) She explained that her

4

sister took her grocery shopping about once a week, but that she needed to lean on the cart for support and could not reach items that were over her head or down low on a shelf, and would sometimes need to take breaks. (R. 66, 71-72.) She indicated that she did not need any equipment to walk and that she had improved in her ability to maneuver the stairs in her home. (R. 68-69.) She testified that she experienced stress, and that she had swelling in her hand and her feet and difficulty grabbing things with her left hand. (R. 73.) She reported feeling fatigue as a result of her medication. (R. 72.)

### D. **Vocational Expert's Testimony**

The ALJ asked Vocational Expert ("VE") Grace Gianforte whether a hypothetical person with the same age, education, and work experience as Plaintiff, and an RFC allowing her to lift and carry twenty pounds occasionally and ten pounds frequently and an ability to stand or walk for about four hours and sit for about six hours in an eight workday, with the additional limitations that she is unsuited for work that requires intense concentration for extended periods due to pain and discomfort and that she is unable to work at heights, climb ladders, or frequently negotiate stairs, could perform any of Plaintiff's past work. The VE said that the inability to sustain intense focus would preclude the Plaintiff's past work, which ranged from the high end of semi-skilled work to skilled work, but that she could perform other sedentary work, including jobs like referral clerk, appointment clerk, referral and information aide, and cashier. In response to further ALJ questioning, the VE noted that, to perform these semi-skilled jobs, the individual

would be transferring skills related to "customer service" and "the coordination of information, answering phones, making appointments, [and] taking messages." The VE further stated that there were about 800 jobs for referral clerks; 3,000 jobs for appointment clerks; and 1,500 jobs for referral and information aides in the regional economy.

E. **ALJ's Decision**

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of October 17, 2008. At step two, the ALJ concluded that Plaintiff's back disorders and history of osteomyelitis were both severe impairments. (R. 27.) Additionally, the ALJ noted that Plaintiff's additional diagnosed impairments of diabetes type 2, hypertension, and moderate obesity caused no more than minimal functional limitations and were therefore non-severe. The ALJ concluded at step three that the impairments, alone or in combination, did not meet or medically equal a Listing. (R. 27-28.) The ALJ then determined that Plaintiff retained the RFC to perform sedentary work as defined in 20 CFR 404.1567(a) with the following limitations: she is unable to work at heights, climb ladders, or frequently negotiate stairs; and she is not suited for work that requires intense focus for extended periods. (R. 28-32.) The ALJ concluded at step four that Plaintiff could not perform her past relevant work. (R. 32.) At step five, based upon the VE's testimony and Plaintiff's age, education, work experience, transferable skills, and RFC, the ALJ concluded that Plaintiff can perform jobs existing in

significant numbers in the national economy, leading to a finding that she is not disabled under the Social Security Act. (R. 32-34.)

## DISCUSSION

I.   **ALJ LEGAL STANDARD**

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 416.920(a)(4).

An affirmative answer at either step three or step five leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step three, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1–4. *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II. JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841; *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (holding that the ALJ's decision must be affirmed even if "'reasonable minds could differ'" as long as "the decision is adequately supported") (citation omitted).

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ must at least minimally articulate the "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex*

*rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions . . . and must adequately articulate his analysis so that we can follow his reasoning . . . ."); *see Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *see Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) ("This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence.").

### III. ANALYSIS

#### A. <u>Medical Evidence Available to the ALJ</u>

Plaintiff argues that the ALJ's decision was in error because, at the time of the hearing, the ALJ did not have access to medical evidence from 2010 and 2011, and because the medical opinions of record predated that evidence. In fact, at the April 2011 hearing, the ALJ had access to medical records dating through October 2010. (R. 54-55.) Additionally, he agreed to leave the record open until May 3 in order to allow Plaintiff to submit more recent medical records. (R. 55.) Plaintiff did

9

so, and the ALJ subsequently reviewed the March-April 2011 records and relied on them in his opinion. (R. 31-32, 38.)

An ALJ has the duty to develop a complete record, and where he "believes that he lacks sufficient evidence to make a decision," he may request additional evidence. *Clifford,* 227 F.3d 863 at 873. He may purchase additional expert opinions where "there is an indication of a change in [a claimant's] condition that is likely to affect [her] ability to work, but the current severity of [her] impairment is not established." 20 CFR 404.1519a. The question of "[h]ow much evidence to gather is a subject on which district courts must respect the Secretary's reasoned judgment," because "one may always obtain another medical examination, seek the views of one more consultant, wait six months to see whether the claimant's condition changes, and so on." *Kendrick v. Shalala,* 998 F.2d 455, 456–57 (7th Cir.1993).

In his June 30 opinion, the ALJ reviewed and described Plaintiff's March and April 2011 treatment notes. Comparing those to the then-available reports of the state agency consultants, the ALJ determined that "evidence received at the hearing level does not show a worsening of claimant's condition" but rather "improvement" since the State agency determinations. (R. 31-32.) Because he has supplied reasoning as to why it was unnecessary to order additional expert opinions, the ALJ's judgment on this matter stands.

### B. Supplemental Evidence Submitted to Appeals Council

Plaintiff next contends that the Appeals Council erred in rejecting as not "new and material" supplemental evidence submitted several months after the

10

ALJ's decision. The supplemental evidence in question was a Medical Source Statement ("MSS") completed by treating physician Dr. Tinfang[1] on September 30, 2011 and an accompanying X-ray report dated September 28, 2011. The Commissioner argues that the Appeals Council did in fact consider the evidence and "nonetheless denied review because this post-decision evidence did not render the ALJ's decision contrary to the weight of the evidence." (Def.'s Mem. at 4.)

The characterization of the Appeals Council's action is important for the purpose of this Court's review. The Appeals Council may grant review when it determines that the record, including any qualifying supplemental evidence, shows the ALJ's conclusions to be "contrary to the weight of the evidence." 20 C.F.R. § 404.970(b); *Getch v. Astrue,* 539 F. 3d 473 (2008). When it decides not to grant plenary review on this basis, its decision is "discretionary and unreviewable," and the ALJ's denial stands as the final and appealable order. *Perkins v. Chater,* 107 F.3d 1290, 1294 (7th Cir. 1997). Only an Appeals Council denial based on a mistake of law, such as an erroneous determination that newly submitted evidence is not material, can be reversed by the Court. *Eads v. Secretary of the Dep't of Health & Human Servs.,* 983 F.2d 815, 817 (7th Cir.1993).

Social Security Administration regulations require the Appeals Council to consider evidence that is "new and material" and "relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b).

---

[1] The MSS is signed by two doctors, Dr. Sengestacke and Dr. Tinfang. Though it is unclear which of these two doctors actually completed the form and other portions of the administrative record credit Dr. Sengestacke, the briefs submitted to this Court describe the author as Dr. Tinfang.

11

Evidence is "new" if it was unavailable to the Plaintiff at the time of the hearing and "material" if "there is a 'reasonable probability' that the ALJ would have reached a different conclusion had the evidence been considered." *Similia v. Astrue,* 573 F.3d 503, 522 (7th Cir. 2009) (citing *Schmidt v. Barnhart,* 395 F.3d 737, 742 (7th Cir. 2005)). Additionally, medical evidence postdating an ALJ's decision is excluded unless it is "relevant to the claimant's condition during the relevant time period encompassed by the disability application under review." *Schmidt*, 395 F.3d at 742.

Notably, where the Seventh Circuit has determined that medical evidence post-dating the hearing dates back to the time before the hearing, the interval between the hearing and the new evidence is typically very short. *See e.g. Farrell v. Astrue,* 692 F.3d 767, 771 (7th Cir. 2012) (confirmed diagnosis of fibromyalgia one month from hearing date related back to the pre-decision period); *compare Bueno Dominguez v. Colvin*, 2015 WL 1064844, *5, No. 13 CV 1637 (N.D. Ill. Mar. 19, 2015) (treatment notes dated twenty-two days after the hearing and eight days after the ALJ's decision related back) with *id.* at *6 (surgical notes dated five months after the ALJ decision did not relate back to the relevant period). Evidence obtained months after a decision may reflect a worsening condition or simply an attempt by a claimant to seek additional medical treatments or evidence to "shore up" her case after an adverse decision. *Id.*

Unfortunately, as is often the case in Appeals Council notices, "divining the basis of the Appeals Council's decision" to decline plenary review—and therefore

whether the Court has jurisdiction to evaluate it—is not easy. *Barth v. Colvin,* 2015 WL 7180094, *6, No. 13 CV 7788 (N.D. Ill. Nov. 16, 2015.) The Notice of Appeals Council Action simply indicates that the Appeal Council "considered… the additional evidence listed on the enclosed Order of Appeals Council" and "found this information does not provide a basis for changing the Administrative Law Judge's decision." On its face, this oft-used language does not make it clear whether the Appeals Council considered the evidence qualifying or not. *Farrell,* 692 F.3d 767 at 771.

As the Seventh Circuit has recently reiterated, the standard boilerplate, without any discussion of the specific evidence submitted, is insufficient to show that the Appeals Council found the supplemental evidence to be "new and material." *Stepp v. Colvin,* 795 F.3d 711, 724-25 (7th Cir. 2015). This is even true where, as here, the evidence is specifically mentioned on an exhibit list referenced in the Appeals Council letter. *Id.* at 724.

*Perkins v. Chater*, 107 F.3d 1290 (7th Cir. 1997), cited by the Commissioner as an example of consideration of post-decision evidence, is inapposite. There, the Appeals Council "devoted a paragraph" of its letter to a discussion of the "content and persuasiveness" of the newly submitted evidence before deciding it did not provide basis for plenary review. *Stepp*, 795 F.3d at 722 (discussing *Perkins*, 107 F.3d at 1294). In contrast, a letter that provides "minimal information" about the newly submitted evidence is insufficient to lead to the conclusion that the Appeal Council weighed that evidence. *Id.* Here, as in *Stepp*, the Appeals Council's denial

letter provides minimal information about Plaintiff's supplemental evidence. Therefore, this Court holds that the Appeals Council did not find the supplemental evidence to be qualifying, and evaluates *de novo* whether the Appeals Council made an error of law in that finding.

The Court must therefore examine the newly submitted evidence itself to determine whether it is new and material and relates back to the relevant time period. The supplemental evidence that the Plaintiff offered to the Appeals Council is dated more than five months after the hearing date and three months after the ALJ issued his decision. This evidence was undoubtedly "new," in that it was created after the ALJ's decision. Plaintiff argues that it was also "material," because as an opinion of a treating physician it would have been likely to change the ALJ's decision. Whether or not this is the case is irrelevant, however, because the supplemental evidence does not relate back to the relevant period prior to April 2011. The MSS does indicate that Plaintiff is subject to severe limitations; however, it is not based on clinical evidence dated prior to April 2011. Throughout the MSS, where she was asked to provide specific medical or clinical evidence in support of each of her findings, Dr. Tinfang either left the question blank or wrote, "see attached X-ray." The attached report describes an X-ray performed on September 28, 2011, just two days before the date of the MSS.

Though the MSS also at one point indicates that Plaintiff's limitations date back to 2008, it does not refer to any clinical medical or diagnostic evidence in support of those findings, nor does it specify which limitations date back that far.

14

There is significant evidence in the record to show that at least some of the limitations described in the MSS were not applicable throughout the relevant period. For example, the September 2011 MSS indicates that Plaintiff needs a medically-necessary cane to walk and can never climb stairs; both of these statements run contrary to Plaintiff's April 2011 testimony, in which she indicated that she walked without a cane and was improving in her ability to manage stairs. (R. 68-69, 608, 610.) The lack of any pre-hearing clinical or medical findings cited in the MSS and the document's contradictions with earlier medical evidence all suggest that the supplemental evidence does not relate back to the period of time in question, from October 2008 through April 2011, but instead post-dates that period. Therefore, the Appeals Council properly excluded the supplemental evidence from its consideration. To the extent that these records reflect new impairments or a worsening in her condition since the time of the ALJ's review, Plaintiff's remedy is to submit a new application. *Getch v. Astrue,* 539 F.3d 473, 484 (7th Cir. 2008); *Kapusta v. Sullivan*, 900 F.2d 94, 97 (7th Cir. 1989).

C. **Transferable Skills**

Plaintiff also contends that the ALJ erred when, at Step 5, he found that she could perform jobs existing at significant numbers in the regional economy by use of "transferable skills" from her past jobs. The burden is on the Commissioner "to establish the existence of a significant number of jobs that the claimant can perform." *McKinnie v. Barnhart*, 368 F.3d 907, 911 (7th Cir. 2004). Although expert standards at an ALJ hearing are less stringent than those under the Federal Rules

15

of Evidence, "an ALJ's findings must be supported by substantial evidence" and thus "an ALJ may depend upon expert testimony only if the testimony is reliable." *McKinnie*, 368 F.3d 907 at 910.

Per SSR 82-41, a "skill" is "knowledge of a work activity which requires the exercise of significant judgment that goes beyond the carrying out of simple job duties." A skill is transferable if it "can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work." 20 C.F.R. § 404.1568(d)(1); *Parrott v. Astrue*, 493 F. App'x 801, 804-05 (7th Cir. 2012) (unpublished decision). Transferable skills are not typically acquired from jobs at the low end of semi-skilled work, but can be acquired from skilled work and from work at the high end of semi-skilled. SSR 82-41. Where transferability of skills from prior work is material to the determination that the claimant can perform a particular job, the ALJ must identify the specific skills the claimant has acquired and list specific occupations to which the acquired work skills are transferable. SSR 82-41; *Abbott v. Astrue*, 391 Fed. App'x. 554, 558 (7th Cir. 2010) (unpublished decision).

A job title alone is not indicative of the skills acquired through past work; instead, "close attention must be paid to the actual complexities of the job" as performed by the claimant. SSR 82-41. For example, an ALJ erred in improperly by relying on VE testimony that was based on a "general understanding" of what a job entailed rather than the job duties actually performed by the claimant. *Abbott*, 391 Fed. App'x. at 558. *See also Key v. Sullivan*, 925 F.2d 1056, 1062 (7th Cir. 1991)

(where the VE neither asked about nor testified to the prior job as the claimant *"actually performed it,"* the conclusion that the claimant could do the job of cashier was "premature and unfounded." (emphasis in original)).

Accordingly, in the presence of the VE, the ALJ carefully questioned Plaintiff about the specific substance of her past work. In her more recent jobs as a CNA, Plaintiff had cared for patients and had made nurse's notes. In her prior job at a drapery store, in addition to sewing draperies (which by itself would be considered at the lower end of semi-skilled work, from which "transferability of skills is not usually found," SSR 82-41), Plaintiff had answered the phones, done retail sales, and visited customers' homes to take measurements as a drapery estimator. The VE characterized these activities on the higher end of semi-skilled work. As a result of this testimony, the VE opined that Plaintiff had transferable skills including "customer service skills, and the coordination of activities such as answering phones, making appointments, and taking messages." (R. 77.)

Subsequently, in his opinion, the ALJ cited the VE's testimony and listed the specific work skills Plaintiff acquired while performing retail sales: "answering phones, making appointments, and taking messages." (R. 32.) The ALJ also made specific note of and relied on the VE testimony indicating that the jobs of referral clerk, appointment clerk, and referral information aide require "skills acquired in the claimant's past relevant work experience but no additional skills." Plaintiff disputes this portion of the findings, contending that the Dictionary of Occupational Titles ("DOT") indicates that those jobs require skills that Plaintiff does not have.

17

For example, a referral clerk "reviews records" and "records referral information;" an appointment clerk "may receive payment for services, and record them in a ledger;" and a referral and information aide "responds to complaints" and "questions callers to ascertain nature of complaints." (Pl.'s Br. at 15-16.)

The activities cited by Plaintiff are by their nature job *duties,* which are distinct from the skills required to perform those duties. "The transferability of skills is a determination entrusted to the ALJ." *Abbott,* 391 Fed. App'x. at 558; S.S.R. 82–41(a)(3). It is not necessary for skills to be transferable that the duties of the jobs be precisely alike. *See, e.g., Harris v. Astrue*, 646 F. Supp. 2d at 998 (N.D. Ill. 2009) (claimant's "people skills, instructing skills, and analytical skills" were "properly classified as transferable work skills.") The customer service skills Plaintiff has are applicable to a wide variety of jobs. *See, e.g., Todd v. Astrue*, 2012 WL 3096681, No. 10 C 4673 (N.D. Ill. July 30, 2012) (customer service skills gained as a bartender were transferable to jobs including information clerk). The ALJ properly articulated his reasoning on this point, and his conclusion is supported by substantial evidence in the record. The Court therefore affirms the ALJ's decision.

## CONCLUSION

For the foregoing reasons, Plaintiff Sheila Yarber's motion for summary judgment [Doc. No. 10] is denied, and the Defendant's motion for summary judgment [Doc. No. 23] is granted.

**SO ORDERED.**                                     **ENTERED:**

*[signature: Maria Valdez]*

**DATE:** **December 4, 2015**                     _____
                                                    **HON. MARIA VALDEZ**
                                                    **United States Magistrate Judge**